AO 106 (Rev. 04/010) Application for Search Warrant          AUTHORIZED AND APPROVED/DATE:    s/Allison Christian 3.27.2024

# UNITED STATES DISTRICT COURT
for the

_____ WESTERN _____ DISTRICT OF _____ OKLAHOMA _____

| | |
|---|---|
| PROPERTY KNOWN AS:<br>**3415 QUAIL DRIVE, APT. 9**<br>**WOODWARD, OK 73801 AND THE RED**<br>**CHEVROLET CAPTIVA, BEARING**<br>**OKLAHOMA LICENSE PLATE BMU084,**<br>**AND REGISTERED TO SHAWN**<br>**TAYLOR AND DAVID DEZORT** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No: M - 24 - 266-AMG

**FILED**

MAR 2 8 2024

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____ , DEPUTY

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim.P.41(c) is*(check one or more)*:
- ☒ evidence of the crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of and access with intent to view child pornography |

The application is based on these facts:

See attached Affidavit of Special Agent Caden Hardin, Federal Bureau of Investigations, which is incorporated by reference herein.

- ☐ Continued on the attached sheet(s).
- ☐ Delayed notice of [No. of Days]  days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

_____
*Applicant's signature*
Caden Hardin, Special Agent, FBI

Sworn to before me and signed in my presence.

Date: 3/27/24

City and State: Oklahoma City, Oklahoma

_____
*Judge's signature*

AMANDA MAXFIELD GREEN, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Caden Hardin, a Special Agent of the Federal Bureau of Investigation ("FBI"), Oklahoma City Division, being duly sworn, state:

### AFFIANT'S BACKGROUND

1.     I am a Special Agent ("SA") of the FBI and have been so employed since January of 2021. Currently, I am assigned to the Woodward Resident Agency, Oklahoma City Field Office, and investigate criminal violations in the Woodward, Oklahoma, region.

2.     I am a graduate of the FBI Academy in Quantico, Virginia. As part of my training, I received approximately 20 weeks of instruction at the FBI Academy. During the training, I received instruction in a variety of investigative techniques commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of confidential human sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies and skills, forensic techniques, and a variety of other subjects. While employed by the FBI, I have investigated various crimes, including, but not limited to, violent crimes against children. Based on my training and experience related to the investigation of child pornography and based upon interviews I have conducted with other officers, defendants, informants, and other witnesses and participants in child exploitation, I am familiar with the ways that child pornography is manufactured and distributed. My familiarity includes the various means and methods by which producers of child pornography manufacture and distribute pornography, their use of cellular telephones,

1

computers, and other electronic devices. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.

## PURPOSE OF AFFIDAVIT

3.     I have probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations 18 U.S.C. § 2252A(a)(5)(B) (possession of and access with intent to view child pornography (and attempt)) are presently located within 3415 Quail Drive, Apt 9, Woodward, Oklahoma (the "**SUBJECT PREMISES**"). I submit this Application and Affidavit in support of a search warrant authorizing a search of the **SUBJECT PREMISES**, as further described in Attachments A and B, incorporated herein by reference, which is located in the Western District of Oklahoma. Located within the **SUBJECT PREMISES** to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the entire **SUBJECT PREMISES**, including the residential dwelling and premises structures, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as contraband and instrumentalities, fruits, and evidence of crime.

4.     Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

2

## STATUTORY AUTHORITY

5.      .As noted above, this investigation concerns alleged violations of the following:

a.      18 U.S.C. §§ 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.      The following definitions apply to this Affidavit and Attachment B:

a.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

b.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the

3

visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.       "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

d.       "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e.       The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

f.       "Internet Protocol address" or "IP address," as used herein, refers to a

4

unique number used by a computer or other digital device to access the Internet. IP addresses can be "dynamic," meaning that the internet service provider assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

   g.  "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

   h.  "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

   i.  "Records," "documents," and "materials," as used herein, include all information recorded in any form and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

   j.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

   k.  "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes

undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## FACTS AND CIRCUMSTANCES

7.    The FBI is conducting a criminal investigation into David Lee Dezort (the "SUBJECT").

8.    On or about September 5, 2023, the FBI Oklahoma City Field Office learned that an individual in Louisiana had disclosed information related to a crime in Oklahoma. The FBI New Orleans field office notified the FBI Oklahoma City that Grant Durtschi ("Durtschi"), a subject in New Orleans, disclosed that he photographed minor children. Many of the images were sexually suggestive and involved prepubescent children. Durtschi then sold these photographs on the Internet. Specifically, Durtschi produced photographs of a minor known as "P.J." Many of the photos in P.J.'s collection showed her prepubescent nude genitalia.

9.    On February 6, 2024, I reviewed the images provided by FBI New Orleans that were part of P.J.'s collection, and a few of the files are described herein:

   a.    File Name: 910A1779

        Description: a blonde prepubescent female can be seen standing on a bed with a white comforter and a tan pillow with a flower pattern behind her, looking at the camera. The female is fully nude and genitalia exposed. The

6

female has, what seems to be, a purple-colored paint around her pubic area to resemble underwear or a bikini bottom. The female also has a pink-colored X drawn from her clavicle area to her breast and covering her nipples.

b.  File Name: 910A0504

Description: In another photo in the collection, a blonde prepubescent female can be observed laying on a bed with a white comforter. The female is wearing a white, button-up blouse with no pants or underwear. The female is using her left hand to grab her left foot, and her genitalia is exposed.

c.  File Name: IMG_8003

Description: Photo of SUBJECT driver's license including SUBJECT full name and date of birth.

10.     The Tenth Circuit has looked to six factors from *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), to determine whether images are "lascivious" as used (but undefined) in the child pornography statutes, including:

a.  "whether the focal point of the visual depiction is on the child's genitalia or pubic area;"

b.  "whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;"

c.  "whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;"

d.  "whether the child is fully or partially clothed, or nude;"

e.  "whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;" and

7

     f. "whether the visual depiction is intended or designed to elicit a sexual response in the viewer,"

*United States v. Helton*, 302 F. App'x 842, 847–48, (10th Cir. 2008).

    11.    Under the *Dost* factors, I believe the images from P.J.'s collection are lascivious and constitute child pornography. The minor victim is prepubescent, and her genitalia is the focal point of the photos. She is lying on a bed, in a sexually suggestive manner and setting, and is partially clothed or nude in the photographs. In the nude photographs, she has glow-in-the dark body paint on her breasts and around her genitalia. The photographs show the prepubescent minor in unnatural poses on a bed, which are intended or designed to elicit a sexual response in the viewer.

    12.    Durtschi maintained a ledger of clients who purchased images from him. Durtschi disclosed to FBI New Orleans that he sold photos from P.J.'s collection to the SUBJECT. For P.J.'s collection, the SUBJECT paid Durtschi approximately $1,465.00 via Venmo using an alias such as "John Nobody."

    13.    On November 1, 2021, FBI New Orleans received the relevant Venmo records pursuant to a grand jury subpoena. According to Venmo records, from January 2021 through August 2021, "John Nobody," using the email address idiotidiot2@tutanota.com, sent approximately $1,465.00 in total through multiple transactions to Durtschi. Based on the IP addresses of the Venmo transactions involving "John Nobody," the transactions linked back to Taloga, Oklahoma, Seiling, Oklahoma, Fairview, Oklahoma, and Woodward, Oklahoma.

14.     On August 23, 2023, law enforcement officers interviewed Durtschi who described the SUBJECT as having incestuous goals, meaning that the SUBJECT wished to have a baby with a woman for the purpose of producing a child with whom he could have sexual relations.  Durtschi also knew that the SUBJECT lived with his parents and worked at a grocery store in Woodward, Oklahoma.

15.     Durtschi told law enforcement that he knew the SUBJECT was from Oklahoma because he asked the SUBJECT to provide his driver's license to Durtschi for verification. The address listed on his driver's license at that time was 310 Hemlock, Woodward, Oklahoma 73801. On February 14, 2024, FBI conducted a database check on the SUBJECT, which showed 310 Hemlock was a prior address associated with the SUBJECT.

16.     The National Crime Information Center indicates that the SUBJECT was issued a new Oklahoma driver's license on July 9, 2021, which lists the **SUBJECT PREMISES** as his address.

17.     Law enforcement databases also indicate that the SUBJECT lives with Katrina Taylor ("Taylor"), who appears to be his mother, at the **SUBJECT PREMISES**.

18.     On September 6, 2023, law enforcement conducted an interview of G.K., who is a neighbor of the SUBJECT. In the interview, G.K. stated that he knew the SUBJECT worked at the United Supermarket and had witnessed the SUBJECT coming to and leaving the **SUBJECT PREMISES** between 12 p.m. and 1 p.m. in a United Supermarket uniform. G.K. stated that it seemed the SUBJECT was on his lunch break.

19.     FBI New Orleans also learned that the email address used for Venmo, idiotidiot2@tutanota.com (the "SUBJECT EMAIL ADDRESS"), was associated with the name "John Nobody," who had a date of birth of 5/11/1988, and telephone number of (580) 334-4506. FBI New Orleans linked the telephone number of (580) 334-4506 to the SUBJECT, who also had a date of birth of 5/11/1988.

20.     On December 6, 2023, an administrative subpoena was issued to Pioneer Cellular ("Pioneer") for phone number (580) 334-4506, and a return was received on December 12, 2023. Pioneer provided the following subscriber information:

a.      Name: David Lee DeZort Jr.

b.      Address: 3415 Quail Dr., Apartment 9, Woodward, OK

c.      Employer: United Supermarket

d.      Length of Service: May 11, 2006 – September 18, 2023

21.     On February 8, 2024, I conducted a postal check with the United States Postal Service ("USPS") on the **SUBJECT PREMISES**. The postal check was returned on February 8, 2024, stating that the mail carrier does receive mail for the SUBJECT at the **SUBJECT PREMISES** but does not deliver it due to SUBJECT's name not being on the box.

22.     On February 9, 2024, FBI Oklahoma City began 24-hour video surveillance on the **SUBJECT PREMISES**. Between February 14, 2024, and February 15, 2024, I reviewed video surveillance of the **SUBJECT PREMISES** from February 9, 2024, through February 14, 2024. Upon review, it appears the SUBJECT is the only person who accessed the **SUBJECT PREMISES** during that timeframe. Additionally, it appears that

10

the SUBJECT is also the only person who drove his suspected vehicle, a Red Chevrolet Captiva, Oklahoma license plate BMU-084 (the "**SUBJECT VEHICLE**"), during that timeframe.

23.    On February 27, 2024, I reviewed additional video surveillance of the **SUBJECT PREMISES** from February 16, 2024, through February 26, 2024. During this period, the SUBJECT is the only person who accessed the **SUBJECT PREMISES**. The SUBJECT was also the only person who accessed the **SUBJECT VEHICLE** during this timeframe.

24.    The **SUBJECT VEHICLE** is registered to "Shawn Taylor," with the SUBJECT listed as the second owner. Further investigation revealed that Shawn Taylor is likely the SUBJECT's sibling or stepsibling. I frequently observed the SUBJECT driving the **SUBJECT VEHICLE** and the **SUBJECT VEHICLE** parked outside of the **SUBJECT PREMISES**.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS AND THE INTERNET

25.    I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b.    Digital cameras and smartphones with cameras save photographs or videos

11

as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer with a cable or via wireless connections, such as "Wi-Fi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.     A device known as a modem allows any computer to connect to another computer using a telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

12

e.       The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.       Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.       As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally, such as the traces of the path of an electronic communication, which may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

26.      As described above and in Attachment B, this Application seeks permission

13

to search for records that might be found on the **SUBJECT PREMISES** in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27.     I submit that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in

14

particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

28.      As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information,

15

such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of

16

computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, pieces, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be

17

sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

       e.       Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti- virus programs (and associated data) may be relevant to establishing the user's intent.

       f.       I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

       29.       Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and

internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for several reasons, including the following:

      a.     Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

      b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

      c.     The volume of data stored on many computer systems and storage devices

19

will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

      d.    Computer users can attempt to conceal data within computer equipment and storage devices through several methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

      30.    Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the

network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

31.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am seeking would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including, but not limited to: computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO TRANSPORT, DISTRIBUTE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

32.    Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who

21

transport, distribute, possess, and/or access with intent to view child pornography:

a.      Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.      Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for

22

several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis; however, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.

     e.      Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

     f.      Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370–71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010).)

pornography.

g.      Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if the SUBJECT uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the **SUBJECT PREMISES**, as set forth in Attachment A.

<u>**BIOMETRIC ACCESS TO DEVICES**</u>

33.      I request that this warrant permits law enforcement agents to obtain from the SUBJECT (and not other persons located at the **SUBJECT PREMISES**) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) (specifically including tablets and cellular phones) subject to search and seizure pursuant to this warrant. The grounds for this request are as follows:

a.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

24

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.      If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera

25

to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.      As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the electronic devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the electronic device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be

26

unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for eight hours and the passcode or password has not been entered in the last six days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require the SUBJECT, if found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

i.      Due to the foregoing, if law enforcement personnel encounter any device(s)

that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant would permit law enforcement personnel to obtain from the SUBJECT the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the SUBJECT to the fingerprint scanner of the device(s) found at the **SUBJECT PREMISES**; (2) hold the device(s) found at the **SUBJECT PREMISES** in front of the face of the SUBJECT to activate the facial recognition feature; and/or (3) hold the device(s) found at the **SUBJECT PREMISES** in front of the face of the SUBJECT to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

j.       The proposed warrant does not request authority for nor authorize law enforcement to compel any person other than the SUBJECT to state or otherwise provide the password for, or to identify which specific biometric characteristics (including the unique finger(s) or other physical features) may be used to unlock or access any device(s). However, during the execution of the requested warrant, law enforcement agents may seek to obtain such information voluntarily from persons present at the **SUBJECT PREMISES**.

## CONCLUSION

34.    Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the **SUBJECT PREMISES**, described in Attachment A. I respectfully request that this Court issue a search warrant for the **SUBJECT PREMISES**, authorizing the search and the seizure of the items described in Attachment B.

35.    I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Further Your Affiant sayeth not.

Caden Hardin, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this the 28th day of March, 2024, in Woodward, Oklahoma.

Amanda Maxfield Green
United States Magistrate Judge

29

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The entire property located at 3415 Quail Drive, Apartment 9, in Woodward, Oklahoma, (the "**SUBJECT PREMISES**"). The **SUBJECT PREMISES** to be searched is an apartment that is on the far corner of the right row of apartments as you enter the complex in the first drive on the left, south. The **SUBJECT PREMISES** faces east. The apartment is a single-story structure with red brick, a white door, and a tan metal roof. Additionally, the property to be searched includes a red Chevrolet Captiva, bearing Oklahoma license plate number BMU084 (the "**SUBJECT VEHICLE**"), wherever parked, which is registered to the SUBJECT. Photographs of the residence and the **SUBJECT VEHICLE** are shown below.

30



31



32

## ATTACHMENT B

## <u>PARTICULAR THINGS TO BE SEIZED</u>

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Section 2252A (knowingly possessing one or more materials that contain images of child pornography):

1.      Computers or storage media used as a means to commit the violations described above.

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      Evidence of the lack of such malicious software;

33

d.      Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e.      Evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f.      Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.      Evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.      Evidence of the times the COMPUTER was used;

i.      Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.      Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.      Records of or information about Internet Protocol addresses used by the COMPUTER;

l.      Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.      Contextual information necessary to understand the evidence described in this attachment.

34

3.     Routers, modems, and network equipment used to connect computers to the Internet.

4.     Any and all cameras, film, videotapes, or other photographic equipment.

5.     Any and all depictions of minors engaging in sexually explicit conduct.

6.     Records, information, and items relating to violations of the statute described above including:

a.     Records, information, and items relating to the occupancy or ownership of the **SUBJECT PREMISES**, including utility and telephone bills, mail envelopes, or addressed correspondence;

b.     Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c.     Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d.     Records and information relating to the sexual exploitation of children, including correspondence and communications between users of the website described in the warrant application.

e.     Records and information showing access to and/or use of the website described in the warrant application; and

f.     Records and information relating or pertaining to the identity of the person or persons using or associated with the display name or email "idiotidiot2@tutanota.com."

35

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

Law enforcement may utilize any form of biometric identification of David Lee Dezort onto any smartphone or tablet seized at the **SUBJECT PREMISES** in an effort to decrypt such device.